Ronald D. Green (NV Bar No. 7360)
Alex J. Shepard (NV Bar No. 13582)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
ecf@randazza.com

Attorneys for Plaintiff
Universal Life Church Monastery

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| UNIVERSAL LIFE CHURCH MONASTERY a/k/a UNIVERSAL LIFE CHURCH,<br><br>        Plaintiffs,<br><br>    vs.<br><br>CLARK COUNTY, NEVADA; LYNN MARIE GOYA (in her official capacity as Clark County Clerk); STEVE WOLFSON (in his official capacity as the Clark County District Attorney); JANE DOE; JOHN ROE; and JANE POE,<br><br>        Defendants. | Case No. 2:18-cv-02099-RFB-BNW |

## PLAINTIFF UNIVERSAL LIFE CHURCH MONASTERY

## a/k/a UNIVERSAL LIFE CHURCH'S

## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

1.0   INTRODUCTION ........................................................................................... 1

2.0   FACTUAL BACKGROUND & LR 56-1 STATEMENT OF
      UNDISPUTED FACTS ................................................................................ 2

  2.1   THE UNIVERSAL LIFE CHURCH ............................................................. 2

  2.2   THE MARRIAGE OFFICIANT LICENSING SYSTEM .................................. 3

  2.3   DEFENDANTS' BIAS AGAINST "NON-TRADITIONAL" CHURCHES LIKE ULCM .............. 7

  2.4   DEFENDANTS' DISCRIMINATORY AND/OR ARBITRARY TREATMENT OF ULCM ........... 9

3.0   LEGAL STANDARDS .................................................................................. 11

4.0   ARGUMENT .............................................................................................. 11

  4.1   ULCM HAS STANDING ........................................................................ 11

  4.2   DEFENDANTS VIOLATED THE FREE EXERCISE CLAUSE ....................... 12

    4.2.1   Free Exercise Principles ......................................................... 12

    4.2.2   Defendants substantially burdened ULCM's free exercise rights without justification . 14

  4.3   DEFENDANTS VIOLATED ULCM'S EQUAL PROTECTION AND
        DUE PROCESS RIGHTS ........................................................................ 17

    4.3.1   ULCM prevails under a strict scrutiny analysis ...................... 17

    4.3.2   Alternatively, ULCM also prevails under rational basis review ........................ 19

5.0   CONCLUSION ........................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................. 11

*Arizonans for Official English v. Arizona,*
  520 U.S. 43 (1997) ................................................................. 11

*Bowman v. United States,*
  564 F.3d 765 (6th Cir. 2008) ................................................ 18

*Brinson v. Linda Rose Joint Venture,*
  53 F.3d 1044 (9th Cir. 1995) ............................................... 11

*Brown v. Entm't Merchants Ass'n,*
  564 U.S. 786 (2011) ............................................................... 19

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940) ............................................................... 12

*Carey v. Piphus,*
  435 U.S. 247 (1978) ............................................................... 17

*Church of Lukumi Babalu Aye v. Hialeah,*
  508 U.S. 520 (1993) ............................................................... 13

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
  473 U.S. 432 (1985) ............................................................... 20

*Corp. of Presiding Bishop of Churches of Jesus Christ of Latter–Day Saints v. Amos,*
  483 U.S. 327 (1987) ............................................................... 16

*Culinary Workers Union, Local 226 v. Del Papa,*
  200 F.3d 614 (9th Cir. 1999) ............................................... 11

*Droz v. C.I.R.,*
  48 F.3d 1120 (9th Cir. 1995) ............................................... 18

*Employment Div. v. Smith,*
  494 U.S. 872 (1990) ............................................................... 12

*Fowler v. Rhode Island,*
  345 U.S. 67 (1953) ................................................................. 13

*Friedman v. Rogers,*
  440 U.S. 1 (1979) ................................................................... 17

*Henry A. v. Willden,*
  2013 U.S. Dist. LEXIS 26765 (D. Nev. Feb. 27, 2013) ...... 17

*Honolulu Weekly, Inc. v. Harris,*
  298 F.3d 1037 (9th Cir. 2002) ............................................................................ 18

*Jesinger v. Nev. Fed. Credit Union,*
  24 F.3d 1127 (9th Cir. 1994) .............................................................................. 11

*Johnson v. Nev. ex rel. Bd. of Prison Comm'rs,*
  Case No. 3:11-cv-00487, 2013 U.S. Dist. LEXIS 139426 (D. Nev. Sept. 26, 2013.) ...................... 14

*Lujan v. Dep't of Wildlife,*
  504 U.S. 555 (1992) .......................................................................................... 12

*Malik v. Brown,*
  16 F.3d 330 (9th Cir. 1994) ............................................................................... 12

*Martinez v. Clark County,*
  846 F. Supp. 2d 1131 (D. Nev. 2012) ............................................................ 17, 18, 19

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
  138 S. Ct. 1719 (2018) ................................................................................... 13, 14

*McDaniel v. Paty,*
  435 U.S. 618 (1978) ...................................................................................... 12, 13

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church,*
  393 U.S. 440 (1969) .......................................................................................... 13

*Reed v. Town of Gilbert,*
  135 S. Ct. 2218 (2015) ...................................................................................... 19

*Sherbert v. Verner,*
  374 U.S. 398 (1963) .......................................................................................... 12

*Torcaso v. Watkins,*
  367 U.S. 488 (1961) .......................................................................................... 13

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  137 S. Ct. 2012 (2017) ...................................................................................... 12

*U.S. v. Ballard,*
  322 U.S. 78 (1944) ........................................................................................... 13

*Universal Life Church v. Utah,*
  189 F. Supp. 2d 1302 (D. Utah 2002) .................................................................. 20

*Walker v. Beard,*
  789 F.3d 1125 (9th Cir. 2015) ............................................................................ 12

*Wyman v. State,*
  217 P.3d 572 (Nev. 2009) .................................................................................. 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**STATUTES**

NRS 122.062 ................................................................................................. 4

NRS 122.064 .........................................................................................3, 4, 14

**RULES**

Fed. R. Civ. P. 56 ......................................................................................... 11

**CONSTITUTIONAL PROVISIONS**

Nevada Const. *art. 1* .................................................................................... 17

U.S. Const. *amend. I* ................................................................................... 12

U.S. Const. *amend. XIV* .............................................................................. 17

**PLAINTIFF UNIVERSAL LIFE CHURCH MONASTERY a/k/a**

**UNIVERSAL LIFE CHURCH'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Universal Life Church Monastery Storehouse, also known as the Universal Life Church ("Plaintiff" or "ULCM") hereby files its Motion for Summary Judgment and requests that the Court enter summary judgment in its favor as to all claims.

## 1.0    INTRODUCTION

ULCM is a church with religious teachings that are in-line with a variety of different "traditional" religions such as Christianity, but its methods of observance differ from "traditional" brick-and-mortar establishments committed primarily to providing Sunday services in that it includes the use of technological elements not used by most traditional churches.  For years, its members were allowed to officiate weddings without substantial restriction in Clark County.  This ended in 2016, however, when the newly elected Clark County Clerk, Defendant Lynn-Marie Goya, promulgated a new set of requirements to the Clerk's Office for which religious organizations were (and were not) permitted to solemnize marriages.  These new requirements gave preference to "traditional" churches that conducted services in brick-and-mortar locations within Nevada, as well as (inexplicably) churches that had obtained tax-exempt status with the IRS.  If a church could not satisfy Defendants, its members could only officiate up to 5 weddings per year in Clark County, and had to receive permission for each individual ceremony.

In 2016, ULCM provided all the documents Defendants said they needed to be placed on their list of approved churches.  Defendants then shifted the goalposts and asked for more documents.  Despite providing ample evidence that ULCM was, in fact, a church licensed to do business in Nevada, Defendants continued to refuse its entry onto their list.  Through the process of discovery, ULCM learned that these requirements were completely arbitrary and were used to mask a bias against "non-traditional" churches such as ULCM.  Defendants' actions are impermissible and expressly prohibited under the First and Fourteenth Amendments to the U.S. Constitution, as well as under the Nevada Constitution.  The Court should grant summary judgment in ULCM's favor as to all claims.

## 2.0   FACTUAL BACKGROUND & LR 56-1 STATEMENT OF UNDISPUTED FACTS

### 2.1   The Universal Life Church

Universal Life Church Monastery[1] ("ULCM") is a non-profit and non-denominational church known to many as the Universal Life Church.[2]  (*See* transcript of deposition of George Freeman ["Freeman Trans."], attached as **Exhibit 2**, at 23:13 to 24:21.)[3]  ULCM is a church that promotes progressive values, and ULCM ministers have a long history of presiding over same-sex and inter-faith weddings alongside traditional weddings.  (*See* Freeman Decl. at ¶ 5.)  It is not a doctrinally strict church, but its key tenets are "do only that which is right" and "every individual is free to practice their religion in the manner of their choosing, as mandated by the First Amendment, so long as that expression does not impinge upon the rights or freedoms of others and is in accordance with the government's laws."  (Expert report of Robert J. Flummerfelt, ULCM000360-367, attached as **Exhibit 3**, at ULCM000363.)[4]

ULCM is multi-denominational and believes that all those who feel called to spiritual life should have easy access to ordination.  (*See* Freeman Decl. at ¶ 6.)  Thus, ULCM offers easy and free online ordination to anyone who wants to become a minister, so long as they provide their full legal name and pledge that they are over the age of 18.  (*See id.*)  Ministers may be ordained online through either of the Church's above-noted websites.  (*See id.* at ¶ 7.)  It also sells books and other minister supplies, such as ordination credentials, ceremony certificates, clothing, wearable accessories, books,

---

[1]   For clarity, there are several ministries that allow online ordination and share the name Universal Life Church ("ULC"), just as there are many different Baptist churches.  ULCM is one of many ULCs and is an offshoot of the original Universal Life Church in California.  ULCM operates two websites about the Church at: <https://www.themonastery.org/> and at <https://www.ulc.org/>.  (*See* Declaration of George Freeman ["Freeman Decl."], attached as **Exhibit 1**, at ¶ 7.)

[2]   ULCM is a spiritual descendant of the "original" Universal Life Church in Modesto, California, but ULCM long ago officially severed ties with and denounced that organization.

[3]   Mr. Freeman is the President of ULCM.  (*Id.* at 22:7-11; 24:23 to 25:2.)

[4]   Though ULCM is arguably non-traditional in the sense it does not have a localized leadership and carries out its activities in cyberspace, it "shares many attributes consistent with other Christian denominations and reflects a Christian ethos, mindset and perspective in its teachings and practice. The Universal Life Church is similar to the Unitarian/Universalist Church in belief and practice."  (*Id.* at ULCM000362.)

wedding supplies, and other religious supplies, to individuals who wish to officiate weddings in a given state.  (Freeman Trans. at 38:14 to 39:13; Freeman Decl. at ¶ 10.)  ULCM also provides these materials in relation to various other religious services, such as funerals, baptisms, regular worship services, and "anything relating to the functionality of a church . . . ."  (*Id.*)  If a particular county requires an applicant seeking to officiate weddings to provide specific documentation, ULCM offers a service by which it prepares user-friendly packets containing all required information at a cost, as well as personalized documents ULCM produces internally to help satisfy all the county's requirements.  (Freeman Trans. at 40:14 to 41:19; Freeman Decl. at ¶ 11.)

While ULCM is headquartered in Seattle, ULCM is registered as a non-profit and non-denominational church with the Nevada Secretary of State.  *See* Universal Life Church Monastery Storehouse Entity Information, ULCM000001-3, attached as **Exhibit 4**.  It provides its religious services primarily online, in "cyberspace."[5]  (Freeman Trans. at 84:22 to 86:2.)  Though it is a church, ULCM is not a registered 501(c)(3) tax-exempt religious organization. (*Id.* at 33:15 to 34:25; 105:3-19.)

For years, ULCM ministers have legally performed marriages in Las Vegas and in Clark County.  (*See* Freeman Decl. at ¶ 12.)  Since Las Vegas is known for non-traditional weddings and events, it is hardly a surprise that ULCM ministers have played a large role in officiating weddings throughout Clark County in the past.  It has over 20 million ordained ministers, and the ability of these ministers "to be able to officiate at weddings, perform baptisms, and preside over funerals is an integral part of [ULCM's] practice of the tenets of its religion."  (**Exhibit 3** at ULCM000364-365.)

### 2.2    The Marriage Officiant Licensing System

This case deals with Clark County's system for licensing individuals to officiate weddings. Individuals may obtain a license to officiate a single wedding, which requirements are not at issue here, or may obtain a certificate to officiate an unlimited number of weddings for a period of five years (a "Permanent Certificate"), which requirements are at issue.  Under NRS 122.064(1), an applicant

---

[5]    Given that traditional, in-person services are banned in many states right now, this would place it in good company.

RANDAZZA | LEGAL GROUP

must meet different qualifications based on whether (1) they are a minister or other church official with a church or religious organization, or (2) they are a notary public.

The statutory requirements to obtain a Permanent Certificate are laid out in NRS 122.062(4) and NRS 122.064(1).  *Inter alia*, applicants who are ministers or other officials of a church must provide an affidavit of authority to solemnize marriages ("AASM") signed and notarized by the church or religious organization of which the applicant is a member.  NRS 122.064(1)(b)(2).  The AASM requires the church to state the applicant is currently in good standing with the church, that it is organized and carries on its work in Nevada, and provide the street address where the church's active meetings are held.  NRS 122.064(5).

The statute's requirements are not exhaustive, however, as it gives permission to the Clark County Clerk to impose additional requirements not defined in the statute.  NRS 122.064(2) lets the Clerk require the church or religious organization of which the applicant is a member "to furnish any evidence which the county clerk considers **necessary or helpful**" to determine the applicant's qualifications (emphasis added).  NRS 122.064(3) provides that, exclusively regarding applicants who are members of a church or religious organization, the Clerk "shall, before approving an initial application satisfy himself or herself that (a) . . . the applicant's ministry is **one of service to his or her church or religious organization** . . . ." (emphasis added).  NRS 122.064(4) allows the Clerk to "require any applicant to submit information in addition to that required by this section."

These requirements have changed in recent years, but in 2016 and 2017, an applicant for a Permanent Certificate, who was a minister or other church or religious official, had to: (1) live in Clark County, Nevada; (2) pay a $25 application fee to the Clark County Clerk; (3) "[s]ubmit a signed and notarized Affidavit of Authority to Solemnize Marriages (AASM) by someone who has authority to speak on behalf of the church or religious organization and can verify that the applicant is currently in good standing;" and (4) pay $49 and pass a background check.  (Defendant Lynn Marie Goya's Answers to Plaintiff's First Set of Interrogatories, attached as **Exhibit 5**, at Answer Nos. 5 & 6.)  In 2018, Defendants added an additional requirement that applicants "[m]ust attend a no-cost training class to learn the roles, responsibilities and legal requirements for Marriage Officiants."  (*Id.* at Answer

No. 7.)  In 2019, Defendants removed the requirement that applicants provide a signed and notarized AASM.  (*Id.* at Answer No. 8.)

In May 2016, Defendants sent a letter to ULCM stating that, due to a change in Nevada law, churches or religious organizations whose members wanted to obtain a Permanent Certificate had to provide documentation to the Clark County Clerk "substantiat[ing] that they are both organized in Nevada under the laws of this state and doing business as a church or religious organization . . . ." (May 20, 2016 letter, CC000042, attached as **Exhibit 6**.)  The required documentation was:

1. Copy of the *Article of Incorporation* **and** the most recent annual *List of Officers and Directors* as filed with the Nevada Secretary of State; - or –
2. Provide any <u>two</u> (2) of the following:
   a. Notarized statement from a member confirming where and when services are held;
   b. Copy of a rental agreement or mortgage statement with the name of the organization and the location where active services are held;
   c. Copy of a recent public notice advertising the organization and the service dates and times, such as a newspaper article, flyer or online web page;
   d. Copy of the letter from the State of Nevada's Department of Taxation granting tax exempt status to the organization as a religious organization; or
   e. Copy of the letter from the Internal Revenue Service (IRS) granting organizational status as a 501(c)(3) religious organization.

(*Id.*) (emphasis in original.)  The letter also required churches to "provide a list of all Marriage Officiants that are still affiliated and authorized by your organization to solemnize marriages."  (*Id.*) Prior to May 20, 2016, Defendants did not require this documentation from ULCM and accepted AASMs signed and notarized by ULCM officials.  (Freeman Decl. at ¶ 12; Transcript of Deposition of Lynn-Marie Goya ["Goya Trans."], attached as **Exhibit 7**, at 36:20 to 37:24.)  In fact, no churches had to provide these documents previously, whether or not they were originally incorporated in Nevada.  (Transcript of deposition of Carl Bates ["Bates Trans."], attached as **Exhibit 8**, at 44:5-15.) From this point on, only churches or religious organizations that provided the above evidence to Defendants' satisfaction were permitted to submit AASMs that would allow applicants to obtain Permanent Certificates.  (Goya Trans. at 24:5 to 25:6.)  Defendants published this list, which was last

updated on November 14, 2018.  (*See* list of approved churches or religious organizations, ULCM000049-61, attached as **Exhibit 9**.)

Ms. Goya explained during her deposition that, to her, a church being "organized under the laws of this state" meant "they did go through the proper licensing and filing with the Secretary of State." (Goya Trans. at 12:15 to 13:8.)  She said that a church must be a Nevada corporation to provide AASMs and that she never considered how such an entity may differ from a church incorporated in another state that has a business license in Nevada.  (*Id.* at 13:24 to 14:13.) In interpreting the requirements of the relevant statutes, Ms. Goya claimed she took instruction from an AGO opinion of 9-29-1994, which said "[a] county clerk must be satisfied that the denomination governing body or church is organized or established in Nevada," and that this could be shown by providing some of the documents required in the May 20, 2016 letter.  (*Id* at 19:8-18.)  She conceded that these were permissive suggestions and that she did not need to require that churches provide such documents.  (*Id.* at 20:14-23.)

Ms. Goya testified that if a church does not have "active meetings" in Nevada, it does not qualify to provide AASMs.  (*Id.* at 50:19 to 51:4.)  Other religious organizations that were placed on the Clerk's approved churches list proved they were "actively ministering in Nevada" by demonstrating that "[t]hey have brick and mortar buildings where they have active meetings," though she said that a brick and mortar building is not required for eligibility.  (*Id.* at 56:25 to 58:6.) Defendants do nothing to determine whether or how often a church has active meetings within Nevada.  (*Id.* at 58:7-19.)

Ms. Goya testified that her understanding of "established in the state" included "actively pursuing your religion within the state." (*Id.* 26:15-20.)  She also said that "organized or established" under the statute "means that they carry on active meetings or active ministry within the State." (*Id.* at 28:15-17.)  She interpreted "active ministry" to include providing a religious service, which could include "doing something to benefit the community on an active basis," such as "[f]eeding the homeless as a group." (*Id.* at 59:3 to 60:9.)  Ms. Goya testified that providing marriage services would not be a service to the community "according to State law," stating that "[i]t's quite clear that a

marriage officiant isn't supposed to be spending – primarily spending their time just in marriages. They have to also have active service." (*Id.* at 60:24 to 61:6.) Despite this, Defendants later, in responses to requests for admission, denied that they "did not consider providing marriage services to constitute the performance of active meetings or religious services sufficient to approve a church or religious organization to issue [AASMs]." (Defendants' Responses to Plaintiff's First Set of Requests for Admission, attached as **Exhibit 10**, at Response Nos. 14-16.)

To be satisfied that a church was organized in Nevada, Ms. Goya required that their Nevada articles of incorporation include a checked box stating that they are a religious organization, despite the requirement not being present in the relevant statutes. (Goya Trans. at 32:20 to 36:19.)

Carl Bates, the records administrator for the Clark County Clerk's Office, testified that, in determining whether a church was doing business in Nevada, "[t]he main thing that we look at when we look at the business entity record is whether or not it is active or revoked. And so **if they are active, then we assume** they are currently registered and provided a list of annual officers and directors with the state, so therefore, **conducting business in the state**." (Bates Trans. at 28:4-19.)[6] Mr. Bates also testified that Defendants determined American Marriage Ministries ("AMM"), another foreign non-profit licensed to do business in Nevada, managed to satisfy Defendants' documentation requirements because its listing on the Nevada Secretary of State web site contained a checkbox showing it was registered as a religious organization. (*Id.* at 29:5 to 30:3, 30:17-21.)

### 2.3    Defendants' Bias Against "Non-Traditional" Churches Like ULCM

In February 2015 emails between Ms. Goya and two other employees of the Clerk's Office, James Pierce[7] and Neftali Cota, Mr. Pierce said "[t]here are straw-man religious organizations that

---

6    Mr. Bates's job duties involved overseeing the supervisors and the staff for the Marriage License Bureau and "get[ting] involved in many different policies and procedures for the administrative side of the house." (*Id.* at 6:10-21.) Overseeing the Marriage License Bureau is his "primary function," and he has been in the position since July of 2015. (*Id.* at 7:4-10.) His "opinions are asked for when it comes to setting policy for marriage licensing." (*Id.* at 8:24 to 9:1.) He thus has personal knowledge of the process in formulating and implementing policy regarding marriage officiants.

7    Mr. Pierce is the assistant county clerk for Clark County, Nevada, and has been for 10 years. (Transcript of deposition of James Pierce ["Pierce Trans."], attached as **Exhibit 11**, at 4:13-20.)

people use to get a minister license," to which Mr. Cota responded "[y]es, this is typically the route that these individuals go through." (February 2015 email exchange, CC000770-774, attached as **Exhibit 12**.) Mr. Cota provided a list of "the top organizations in this field," which included ULCM. (*Id.*) In response to Mr. Pierce and Mr. Cota providing the names of other churches, Ms. Goya said "[i]s this a joke or are these actually legal?" (*Id.*) Mr. Cota responded "[a]ll legal with individuals that we authorized. The Church of Bacon was a headache that took forever." (*Id.*) Mr. Pierce then said "[i]t's a legal way to get around the religious affiliation requirements. The Notary authorization is more expensive and requires training, so I doubt these organizations will go away." (*Id.*)

Mr. Pierce testified that "straw-man religious organizations" meant "organizations that aren't necessarily performing religious functions but are meeting the guidelines of the statutes to the point where they can establish ministers as ministers for their organizations." (Pierce Trans. at 29:16-25.) He drew a distinction between these and "traditional" churches, saying "a church, as an example, in town that has regular meetings, a congregation, pastor and an organization that authorizes the pastor to represent for marriages" is a "traditional religious organization." (*Id.* at 30:20 to 31:7.) He testified that an example of a "straw-man religious organization" is "the Flying Spaghetti Monster Church" because "**[i]t's kind of an unusual name, and it leads you to believe that perhaps they're not really religious**." (*Id.* at 31:8-18.)

In April 2016, Mr. Bates and Ms. Goya had an email exchange in which Ms. Goya asked "[c]an you send me a link to a few of the really fishy ones?" in a discussion about the Clerk's Office's ability to develop a program for licensing marriage officiants. (April 2016 email exchange, CC000822-823, attached as **Exhibit 13**.) Ms. Goya testified that "fishy ones" in this exchange referred to churches "that don't appear to comply to the law." (Goya Trans. at 61:19 to 62:1.) Mr. Bates responded with a list of "[s]ome of the organizations that I am aware of that fit into this area," which included ULCM. (**Exhibit 13**.) Ms. Goya testified that "[i]t appears that these [churches on Mr. Bates's list] are **not traditional churches**." (Goya Trans. at 62:2-15) (emphasis added.)

Mr. Bates testified that the purpose of this email exchange "was to try to identify organizations that were submitting an Affidavit of Authority that I would say just **didn't have a traditional church**

doing business, you know, a chapel, a church or whatever here in town, holding services, ones that we knew that were coming in different ways and **had different names**." (Bates Trans. at 32:17 to 33:11) (emphasis added.) He interpreted the term "fishy ones" to mean "some of the different organizations that **didn't fit the traditional model of a church** here in town to try to see whether or not their establishment in the state met the statutes." (*Id.* at 33:20 to 34:1) (emphasis added.)

**2.4     Defendants' Discriminatory and/or Arbitrary Treatment of ULCM**

Shortly before sending the May 20, 2016 letter, Defendant Goya and the records administrator for the Clerk's Office, Carl Bates, discussed whether ULCM should be considered a church or religious organization for purposes of accepting AASMs from it. (*See* May 6, 2016 email exchange between Carl Bates and Lynn-Marie Goya, CC000517-520, attached as **Exhibit 14**.) In this exchange, Mr. Bates attached screenshots from the Nevada Secretary of State web site showing that ULCM was registered to do business in Nevada, that "a NV Business ID will exists [sic]," and that "we have to consider ULC as a religious org." (*Id.*) Ms. Goya responded "[a]gree with both your arguments." (*Id.*) Defendants had thus accepted that ULCM was a church or religious organization prior to sending out their May 20, 2016 letter.

ULCM provided its articles of incorporation, list of officers and directors, and 2016 list of authorized marriage officiants to Defendants on November 7, 2016. (*See* August 2016 to March 2017 email exchange between ULCM and Defendants, ULCM000280-285, attached as **Exhibit 15**.) Defendants responded that they needed the actual list of officers and directors filed with the Nevada Secretary of State, rather than the printout for the ULCM from the Secretary's web site, which ULCM provided on December 7, 2016. (*Id.*) ULCM continued to be left off the list of churches approved to issue AASMs, and Defendants did not respond until March 22, 2017, when they informed ULCM that they *now* required additional documentation beyond what was mentioned in the May 20, 2016 letter. (*Id.*) The email provided no explanation for why Defendants suddenly required more information nearly a year later.

ULCM's counsel at the time, Michael Galletch, then sent a letter to Ms. Goya on April 21, 2017. (*See* April 21, 2017 letter from Michael Galletch, ULCM000156-158, attached as **Exhibit 16**.)

He explained that the statutory changes noted in Defendants' May 2016 letter were unrelated to the question of whether a church or religious organization was "incorporated, organized or established in" Nevada, and that there was no legal basis for requiring ULCM to demonstrate proof of tax-exempt status with the IRS.  (*Id.*)  He sent an additional letter on May 15, 2017 expressing concerns that some of the organizations on Defendants' approved list of churches authorized to issue AASMs were not religious organizations under Defendants' stated standards.  (*See* May 15, 2017 letter from Michael Galletch, ULCM000159-160, attached as **Exhibit 17**.)

Mr. Galletch then had a phone conversation with Ms. Goya on May 17, 2017 and sent a follow-up letter on June 21, 2017 regarding ULCM's alleged lack of documentation.  (*See* June 21, 2017 letter from Michael Galletch, ULCM000038-47, attached as **Exhibit 18**.)  Despite ULCM having already provided these documents, Mr. Galletch attached to this letter the articles of incorporation for ULCM; its Qualification to do Business in Nevada form filed with the Nevada Secretary of State; its list of officers, directors, and resident agent; and its Washington Certificate of Existence/Authorization also filed in Nevada.  (*Id.* at ULCM000040-47.)  Mr. Galletch specifically noted that ULCM's articles of incorporation expressly state that it "is formed for religious purposes, to advance religious faith and practice as taught by the Universal Life Church, to perform acts of charity, and further the benefit of all people.  The Corporation is organized exclusively for charitable, religious and educational purposes . . . ."  (*Id.* at ULCM000038, 40.)  During her deposition, Ms. Goya admitted that ULCM's articles of incorporation, which were provided in November 2016, sufficiently demonstrated that ULCM was a church or religious organization.  (Goya Trans. at 47:21 to 48:1; 52:5-16.)

Ms. Goya responded, in a letter dated August 16, 2017, with the conclusory statement that "we are still not in receipt of sufficient proof that The Universal Life Church Monastery Storehouse is a religious organization with a presence in Nevada," and invited ULCM to provide additional documents.  (*See* August 16, 2017 letter from Ms. Goya, ULCM000048, attached as **Exhibit 19**.)  The letter contained no explanation of how ULCM's documentation was insufficient.  (*Id.*)

During her deposition, Ms. Goya claimed that she continued to deny ULCM's place on Defendants' list of accepted churches because it could not prove that it had a presence or carried on

an active ministry within Nevada, though it did prove it was a church.  (Goya Trans. at 52:5-22.)  Despite this claim, Defendants did place American Marriage Ministries on its approved list of churches even though AMM was a non-Nevada entity that provided no evidence it carried on any kind of services or active ministry within Nevada.  The documents AMM provided to Defendants consisted only of its articles of incorporation, its list of officers, its list of Nevada marriage officiants, and a letter from the IRS affirming AMM's tax-exempt status.  (*See* letter from AMM to Defendants, supporting documents, and 2017 NRS 122.062(1) checklist, ULCM000730-740, attached as composite **Exhibit 20**.)

### 3.0   LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).  Only disputes over facts that will affect the outcome of the suit will preclude entry of summary judgment, and the disputed evidence much be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party has identified parts of the record showing an absence of an issue of material fact, "the nonmoving party must 'designate specific facts showing that there is a genuine issue for trial.'"  *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1048 (9th Cir. 1995).

### 4.0   ARGUMENT

#### 4.1   ULCM Has Standing

"To qualify as a party with standing to litigate, [ULCM] must show, first and foremost, an invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997).  ULCM can show standing by demonstrating that it has been "threatened with prosecution, prosecution is likely, or a prosecution is remotely possible." *Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614, 618 (9th Cir. 1999).

At a constitutional minimum, standing contains three elements: (1) plaintiff must have suffered an injury in fact, an invasion of a legally protected interest which is concrete and particularized, and actual or imminent, not "conjectural" or "hypothetical."  (2) There must be a causal connection

between the injury and the defendant's conduct and traceable to the defendant's actions.  (3) It must be likely, rather than speculative, that the plaintiff's injury will be "redressed by a favorable decision." *Lujan v. Dep't of Wildlife*, 504 U.S. 555, 557 (1992).

Here, ULCM's injury is readily apparent.  The Clark County Clerk's office forbade ULCM from solemnizing unlimited marriages, requiring its ministers to seek permission for each and every marriage they sought to perform.  Moreover, the County limited the number of weddings that its ministers could perform each year.  This was different than the requirements the County set for other churches and had the undeniable effect of discriminating against ULCM.  This Court has the clear power to redress this injustice.  ULCM has demonstrated Article III standing.

### 4.2    Defendants Violated the Free Exercise Clause

#### 4.2.1    Free Exercise Principles

Plaintiff's First and Second Claims for Relief were brought pursuant to the Free Exercise Clauses contained in the Constitutions of the United States and the State of Nevada.  Under the Free Exercise Clause of the First Amendment to the United States Constitution, the government may not prohibit "the free exercise of religion."  U.S. Const. *amend. I*.  It is a fundamental principle of the nation's free exercise jurisprudence that laws imposing special disabilities on the basis of religious status trigger the strictest scrutiny.  *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, – U.S. –, 137 S. Ct. 2012, 2015 (2017). This standard "demands a state interest 'of the highest order' to justify the policy at issue."  *Id.* at 2016 (*quoting McDaniel v. Paty*, 435 U.S. 618, 628 (1978)).

Ordinarily, a plaintiff asserts a successful free exercise claim if it alleges that: (1) its proffered beliefs are sincerely held; and (2) its claims are rooted in religious belief and not on purely secular philosophical concerns.  *See Walker v. Beard*, 789 F.3d 1125, 1128 (9th Cir. 2015) (*quoting Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994)).  The Free Exercise Clause is applicable to the states by incorporation into the Fourteenth Amendment.  *See Employment Div. v. Smith*, 494 U.S. 872, 876-77 (1990) (*citing Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)).

The First Amendment excludes all "governmental regulation of religious beliefs."  *Sherbert v. Verner*, 374 U.S. 398, 402 (1963).  The First Amendment prohibits the government from: (1)

compelling affirmation of religious belief (*Torcaso v. Watkins*, 367 U.S. 488 (1961)); (2) punishing the expression of religious doctrines it believes to be false (*U.S. v. Ballard*, 322 U.S. 78, 86-88 (1944); (3) imposing restrictions on the basis of religious views or religious status (*McDaniel*, 435 U.S. 618; *Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953); and (4) lending its power to one side in a controversy over religious authority or dogma (*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. 440, 445-452 (1969)).

If federal and state governments are to "respect the Constitution's guarantee of free exercise, [they] cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, – U.S. –, 138 S. Ct. 1719, 1731 (2018). In fact, the Free Exercise Clause "bars even 'subtle departures from neutrality' on matters of religion." *Id.* (*quoting Church of Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 534 (1993)).   The Constitution "commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and the rights in secures." *Church of Lukumi Babalu Aye*, 508 U.S. at 547.

The First Amendment guarantees "that our laws [will] be applied in a manner that is neutral toward religion." *Masterpiece Cakeshop*, 138 S. Ct. at 1732.   Factors relevant to the assessment of government neutrality include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision making body." *Church of Lukumi Babalu Aye*, 508 U.S. at 540.  The government "has no role in deciding or even suggesting whether [a religious belief] is legitimate or illegitimate." *Masterpiece Cakeshop*, 138 S. Ct. at 1731.

Similar to the First Amendment of the United States Constitution, Article 1, Section 4 of the Constitution of the State of Nevada provides that "[t]he free exercise and enjoyment of religious profession and worship without discrimination or preference shall forever be allowed in this State."

Compared with federal jurisprudence regarding the First Amendment to the U.S. Constitution, comparatively little caselaw exists regarding Article 1, Section 4 of the Nevada Constitution. However, it is considered coextensive with the First Amendment's Free Exercise Clause. *See Johnson v. Nev. ex rel. Bd. of Prison Comm'rs*, Case No. 3:11-cv-00487, 2013 U.S. Dist. LEXIS 139426, at *10 (D. Nev. Sept. 26, 2013.)

### 4.2.2   Defendants substantially burdened ULCM's free exercise rights without justification

Defendants' licensing scheme that discriminated against ULCM ministers facially discriminates based on the exercise of religion. NRS 122.064(1) creates one set of requirements for religious marriage officiants, and one set of requirements for non-religious officiants. The scheme, Defendants' additional requirements not laid out in the statute, and Defendants' enforcement of these requirements, are thus subject to strict scrutiny review.

Defendants unquestionably placed a substantial burden on ULCM's right of free exercise of religion. Their decision not to accept AASMs from ULCM prevented ULCM's ministers from freely being able to officiate weddings in Clark County, a core tenet of ULCM's religious beliefs. (**Exhibit 3** at ULCM000363-365.) Defendants thus must show that this burden was imposed in furtherance of a compelling government in the least restrictive means possible, which they cannot do.

Ms. Goya testified that the purpose of the additional requirements she imposed on churches starting in May 2016 was to determine whether a given church (1) was actually a church or religious organization, and (2) that it was "incorporated, organized or established" in Nevada. (Goya Trans. at 12:15 to 13:8; 32:20 to 36:19.)

This first inquiry raises immediate constitutional concerns, as the government "has no role in deciding or even suggesting whether [a religious belief] is legitimate or illegitimate." *Masterpiece Cakeshop*, 138 S. Ct. at 1731. And although Ms. Goya acknowledged that it was not Defendants' job to determine the validity of a given religion, it is apparent Defendants applied extra scrutiny to religious organizations they deemed to be "fishy" or non-traditional, including ULCM. (*See* **Exhibit 12** (discussing "straw-man religious organizations," including ULCM); Pierce Trans. at 30:20 to 31:18

(distinguishing between "straw-man" organizations and "traditional" churches, and testifying that "straw-man religious organizations" included ones with unusual names that "lead[] you to believe that perhaps they're not really religious"); **Exhibit 13** (considering ULCM to be a "fishy" religious organization); Goya Trans. at 62:2-15 (testifying that "fishy" religious organizations listed by Mr. Bates "are not traditional churches"); Bates Trans. at 32:17 to 34:1 (testifying that "fishy" churches referred to non-traditional churches with names that differed from traditional churches and "didn't fit the traditional model of a church . . . .")  The record shows that Defendants had a policy of viewing "traditional" and non-traditional churches differently, and applied additional scrutiny to non-traditional churches.  These discussions took place before Defendants promulgated their additional requirements for religious organizations in May 2016, as well, strongly suggesting the purported reasons for imposing these additional requirements are pretextual.  This is particularly true given that Defendants already determined, prior to sending out the May 20, 2016 letter, that ULCM was a religious organization.  (*See* **Exhibit 14**.)  The governmental interest at play here thus appears to be placing "traditional" churches above non-traditional ones, which is far from compelling and, in fact, is constitutionally impermissible.

The second proffered rationale, determining that a church is "incorporated, organized or established" in Nevada, appears to be completely arbitrary, at least in enforcement.  While Ms. Goya had difficulty explaining what the purpose of this requirement was or the definitions of any of the terms she was using, she testified that "organized under the laws of this state" referred to properly filing licensing paperwork with the Nevada Secretary of State.  (Goya Trans. at 12:15 to 13:8.)  ULCM did this, and provided proof in November and December 2016, and then again in June 2017.[8]  (*See* **Exhibit 15**; **Exhibit 18**.)  Somehow this did not satisfy Ms. Goya, even though Mr. Bates testified that, if a church had an active business license in Nevada, "then we assume that they are . . . conducting business in the state."  (Bates Trans. at 28:4-19.)

---

[8]     Defendants already had evidence that ULCM was properly licensed to do business in Nevada, but requested this information from it for no apparent purpose. (*See* **Exhibit 14**.)

RANDAZZA | LEGAL GROUP

Aside from Defendants refusing to place ULCM on its approved list of churches after Defendants had the requested information, some of the types of documents requested by Defendants have no bearing on the question of whether a church carries on an "active ministry" in Nevada. Defendants asked for evidence of tax-exempt status with Nevada and the IRS, even though such documents had no tendency to show a church was carrying on services in the state. Indeed, AMM, a non-Nevada entity that was placed on Defendants' accepted list of churches, provided the same paperwork as ULCM as well as the requested letter from the IRS, which said nothing about AMM's activities in Nevada. (*See* **Exhibit 20**.) Ms. Goya also admitted that Defendants do nothing to determine whether or how often a church has active meetings within Nevada, an alleged pre-requisite to be placed on Defendants' accepted list. (Goya Trans. at 50:19 to 51:4; 58:7-19.) Defendants thus created a licensing scheme which an organization can satisfy while providing no proof that it complies with the purposes of the scheme. The scheme is completely arbitrary and thus fails either to promote a compelling government interest or to be the least restrictive means possible of achieving that interest.

But even beyond the arbitrary nature of this scheme, Defendants admit that their criteria for active ministering services plunge headlong into unconstitutional decisions on the validity of religious practices. Ms. Goya testified that a church must, at bare minimum, provide some service to the community, but that such religious service could not be providing marriage services; "[i]t's quite clear that a marriage officiant isn't supposed to be spending – primarily spending their time just in marriages. They have to also have active services." (Goya Trans. 60:24 to 61:6.)

ULCM's churches, whether physical or online, embody and further the religious expression of its congregants. The freedom of a church to determine which activities further its religious tenets is paramount:

> Determining that certain activities are in furtherance of an organization's religious mission … is thus a means by which a religious community defines itself. Solicitude for a church's ability to do so reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well.

*Corp. of Presiding Bishop of Churches of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). Providing marriage services "is an integral part of [ULCM's] practice of the

tenets of its religion" (**Exhibit 3** at ULCM000364-365), and Defendants' decision that this exercise of religion is not on par with other demonstrations of faith and religious services is unconstitutional.

### 4.3    Defendants Violated ULCM's Equal Protection and Due Process Rights

Plaintiff brought its Third and Fourth Claims for Relief pursuant to the Equal Protection and Due Process Clauses of the Constitutions of the United States and the State of Nevada.  The Equal Protection Clause contained in the U.S. Constitution provides that no state shall deny to any person within its jurisdiction equal protection of the laws.  *See* U.S. Const. *amend. XIV, § 1*.  In other words, "[p]ursuant to the Equal Protection Clause, the government must treat all similarly situated persons alike."  *Martinez v. Clark County*, 846 F. Supp. 2d 1131, 1135 (D. Nev. 2012).  The constitutional guarantee of due process requires that laws provide reasonable notice of prohibited conduct. Procedural due process under the Fourteenth Amendment is meant to protect persons from the mistaken or unjustified depravation of life, liberty, or property.  *See Carey v. Piphus*, 435 U.S. 247, 248 (1978).

A plaintiff asserts a valid equal protection argument if it demonstrates that "a group was singled out for unequal treatment on the basis of religion."  *Id.*  If the law that the plaintiff challenges burdens a fundamental right or makes a distinction based on a suspect classification, the Court should employ strict scrutiny review.  *See id.* at 1146.  Alternatively, if the law does not burden a fundamental right or target a suspect classification, it is subject to rational basis review.  *See id.*

Similarly, the Constitution of the State of Nevada provides that "[n]o person shall be deprived of life, liberty, or property without due process of law."  Nevada Const. *art. 1, § 8*.  Nevada's due process clause is "textually identical to the federal clause in relevant respects," and the "Nevada Supreme Court reads the state clause as coextensive with the federal clause."  *Henry A. v. Willden*, 2013 U.S. Dist. LEXIS 26765, at *18 (D. Nev. Feb. 27, 2013) (*citing Wyman v. State*, 217 P.3d 572, 578 (Nev. 2009)).

### 4.3.1    ULCM prevails under a strict scrutiny analysis

Under the equal protection clause, religion is a suspect classification, entitled to strict scrutiny review.  *See Friedman v. Rogers*, 440 U.S. 1, 17 (1979); *see also Bowman v. United States*, 564 F.3d 765, 772

RANDAZZA | LEGAL GROUP

(6th Cir. 2008).  Under strict scrutiny review, the government must show that the challenged law was "narrowly drawn to serve a compelling state interest." *Martinez*, 846 F. Supp. 2d at 1146 (*citing Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002)).  Heightened scrutiny applies to a statute that applies selectively to religious activity "if the plaintiff can show that the basis for the distinction was religious, not secular." *Droz v. C.I.R.*, 48 F.3d 1120, 1125 (9th Cir. 1995).  As discussed in Section 4.2.2, *supra*, Defendants' marriage officiant licensing scheme facially discriminates on the basis of religion.  Strict scrutiny applies.

Also as discussed in Section 4.2.2, *supra*, Defendants discriminated against ULCM on the basis of its perceived status as a "non-traditional" church.  Defendants' employees, including Ms. Goya herself, discussed "straw-man" and "fishy" religious organizations, and used ULCM as an example of each, prior to promulgating their new requirements in May 2016.  Defendants' employees testified that these "non-traditional" organizations drew suspicions and additional scrutiny from Defendants, and ULCM was required to provide documents above and beyond what was necessary to satisfy Defendants' new requirements.  As a "non-traditional" church, ULCM was discriminated against and denied equal protection under the law.  Defendants had no compelling interest furthered by this discrimination.  Rather, they engaged in this discrimination for the purpose of giving traditional, brick-and-mortar churches an advantage over non-traditional churches.

Relatedly, Defendants also discriminated against ULCM for not holding in-person religious services at a physical location in Nevada.  Most of the documents requested by Defendants to place a church on its approved list relate to evidence of conducting in-person religious services at a physical location in this State.  (**Exhibit 6**.)  Although Ms. Goya testified that a church does not need to have a brick-and-mortar location within Nevada to be placed on the approved list (Goya Trans. at 56:25 to 58:6), it is apparent that Defendants' scheme gives preference to churches that do have such a location.  It is not practical for ULCM to operate physical locations throughout Nevada, nor does it wish to, as doing so would be inconsistent with its model of ministry by requiring a network of physical locations controlled by a central leadership.  (Freeman Decl. at ¶¶ 8-9.)  The necessity of such a preference, assuming any government interest could potentially justify it, is also belied by Defendants' admission

1   that they simply assume organizations licensed with the Nevada Secretary of State are actively doing

2   business in Nevada and do nothing to determine whether an organization is actively ministering in

3   Nevada.  (Goya Trans. at 58:7-19; Bates Trans. at 28:4-19.)

4          Defendants' licensing scheme also gives preferential treatment to churches or religious

5   organizations that have tax-exempt status in Nevada or with the IRS, regardless of whether such

6   organizations actually carry on religious services within Nevada.  ULCM is not a registered 501(c)(3),

7   but it is still a church or religious organization.   (Freeman Trans. at 33:15 to 34:25; 105:3-9.)

8   Defendants give this preference despite it having no relationship at all to the stated purpose of their

9   licensing scheme, making it underinclusive, and thereby "raises serious doubts about whether the

10  government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or

11  viewpoint." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011).  "[A] law cannot be regarded as

12  protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly

13  vital interest unprohibited."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2232 (2015) (internal quotation

14  marks omitted).  If Defendants were actually concerned with ensuring that only members of churches

15  carrying on an active ministry physically within Nevada could solemnize marriages, it would not have

16  allowed organizations such as AMM to satisfy Defendants' licensing scheme by providing only

17  evidence of tax-exempt status, which has no bearing on this inquiry.

18         There is no compelling government interest furthered by more easily allowing ministers of

19  churches with a physical location in Nevada or that have tax-exempt status to officiate weddings in

20  Clark County.  Defendants thus fail to satisfy strict scrutiny and have violated ULCM's due process

21  and equal protection rights.

22                    **4.3.2   Alternatively, ULCM also prevails under rational basis review**

23         While Defendants' actions are subject to strict scrutiny review by this Court, Plaintiff prevails

24  on its Third and Fourth Claims for Relief even if the Court applies the rational basis test, which applies

25  when a law does not burden a fundamental right or target a suspect classification.  *See Martinez*, 846 F.

26  Supp. 2d at 1146.  Under rational basis review, the challenged law will be stricken if it is not "rationally

27  related to a legitimate government purpose."  *Id.*  Under the rational basis test, the "state 'may not rely

RANDAZZA | LEGAL GROUP

on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.'" *Universal Life Church v. Utah*, 189 F. Supp. 2d 1302, 1317 (D. Utah 2002) (*quoting City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985).

Defendants may be able to articulate a rational relationship (though likely a post-hoc one) between their stated goals and their preference for churches with a physical location in Nevada. They cannot, however, do so regarding their explicit preference for tax-exempt organizations and their non-public preference for "traditional" churches. The only conceivable relationship tax-exempt status could have with the goals of a marriage officiant licensing scheme is to bear on the validity of a sponsoring church, which the government affirmatively cannot do. Likewise, the "traditional" or "non-traditional" status of a church can only relate to the purpose of the licensing scheme as a method of determining the validity of a church and its religious beliefs. Defendants' discriminatory preferences can only rationally relate to a constitutionally impermissible goal of Defendants, which is per se illegitimate. Defendants fail to satisfy even the rational basis test.

## 5.0    CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in Plaintiff ULCM's favor as to all claims.

Dated: April 29, 2020.                    Respectfully Submitted,

RANDAZZA LEGAL GROUP, PLLC

/s/ Ronald D. Green

Ronald D. Green (NV Bar No. 7360)
Alex J. Shepard (NV Bar No. 13582)
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117

Attorneys for Plaintiff
Universal Life Church Monastery

Case No. 2:18-cv-02099-RFB-BNW

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 29, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that a true and correct copy of the foregoing document is being served via transmission of Notices of Electronic Filing generated by CM/ECF.

Respectfully Submitted,

_____
Employee,
Randazza Legal Group, PLLC